# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10373

United States Court of Appeals
Fifth Circuit

**FILED**
August 31, 2018

Lyle W. Cayce
Clerk

SEISMIC WELLS, L.L.C.; BARRY TRANCKINO,

Plaintiffs-Appellants,

v.

THE SINCLAIR COMPANIES; SINCLAIR OIL CORPORATION; SINCLAIR OIL AND GAS COMPANY; ROSS B. MATTHEWS,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 5:15-CV-148

Before JOLLY, JONES, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Seismic Wells, L.L.C. and Barry Tranckino appeal the district court's order granting the Sinclair Companies' motion for judgment as a matter of law ("JMOL") on its fraud-based claims and its breach of contract claims related to two contracts between Appellants and the Sinclair Companies. Appellants also appeal the district court's denial of its motion to supplement the record on appeal with video deposition testimony that it argues was presented to the jury

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-10373

as testimonial evidence but was not transcribed into the record. The court has carefully considered this appeal in light of the briefs, oral arguments of counsel, and pertinent portions of the record. We find no reversible error in any of the trial court rulings for the following reasons.

## I.

Seismic Wells, L.L.C., a company that leases land to collect seismic data and determine areas that will profitably produce oil and gas, had a lease on property known as the Miller Ranch, which covers about 20,000 acres of land in Borden and Garza counties, Texas.  In May 2005, Seismic Wells entered a participation agreement ("Initial Participation Agreement") with a company then called Sinclair Oil Corporation ("Sinclair 1").  The parties' dispute concerning the Initial Participation Agreement centers on the implications of a series of corporate reorganizations that Sinclair 1 completed following the agreement.

Through the Initial Participation Agreement, Sinclair 1 purchased a 37.5% interest in Seismic Wells's lease on the Miller Ranch.  As part of the agreement, Seismic Wells agreed to provide Sinclair 1 a copy of its three-dimensional seismic data which covered the lease, subject to the caveat that Sinclair 1 had no ownership of the data and could not "sell, trade or license the [d]ata to any third party."  Though Seismic Wells was the operator of the leases, Sinclair 1 had the option to assume operations with "no obligation to do so."  If Sinclair 1 assumed operations and decided to "sell, transfer or otherwise dispose of its interest in the [l]eases," then Seismic Wells had "the first and exclusive right to assume operations of the [l]eases."  Barry Tranckino, Seismic Wells's sole member and corporate representative, signed the Initial Participation Agreement, and Ross Matthews, Senior Vice President of Sinclair 1, signed on its behalf.

No. 17-10373

In late 2005, Sinclair began a corporate reorganization, creating subsidiaries to take over existing business lines.[1]   Sinclair Petroleum Company, later renamed Sinclair Oil Corporation ("Sinclair 2"), was formed in December 2005 and became a parent company for subsidiaries holding Sinclair's oil and gas assets.  Sinclair 1 also created a new legal entity called Sinclair Oil and Gas Company ("Sinclair 3"), which was the same assumed name that Sinclair 1 had previously owned.  Sinclair 3 was one of the subsidiaries placed under Sinclair 2.  The Miller Ranch lease was transferred from Sinclair 1 to Sinclair 2, and then from Sinclair 2 to Sinclair 3, by means of asset transfers to the newly created subsidiaries.

Sinclair 2 and Sinclair 3 both registered to conduct business in Texas in February 2006 by filing the necessary paperwork with the Texas Secretary of State.  In March 2006, Sinclair 3 also submitted a P-5 Organization Report to the Texas Railroad Commission to take over Sinclair 1's operator bond.  The form indicated Sinclair 3 had a different operator number than Sinclair 1.

Months after the corporate reorganization, Sinclair 3 reached out to Seismic Wells regarding the rights of Sinclair 3 under the Initial Participation Agreement.  A new employee of Sinclair 3 called Seismic Wells to inform it that Sinclair was electing to exercise its option to assume operations and was interested in acquiring additional rights. Following this conversation, Seismic Wells and Sinclair 3 began negotiations to determine their new interests and obligations.  At trial, Tranckino testified he believed the parties would amend the Initial Participation Agreement, but instead, he received a Replacement Participation Agreement.  Notably, the Replacement Participation Agreement was entered into by Seismic Wells and "Sinclair Oil and Gas Company, a

---

[1] The three Sinclair entities sued by Seismic Wells are referred to collectively as "Sinclair."

3

No. 17-10373

Wyoming corporation with offices located at 550 East South Temple, Salt Lake City, Utah 84102." This Sinclair Oil and Gas Company was Sinclair 3, a different legal entity from that named in the Initial Participation Agreement, but to repeat, it bore the assumed name of Sinclair 1.[2]

The Replacement Participation Agreement redefined certain rights and obligations of Seismic Wells and Sinclair 3 contained in the Initial Participation Agreement.  First, Sinclair 3 acquired an additional 15.625% working interest in the Miller Ranch lease from Seismic Wells for $937,500. Tranckino admitted this was "certainly" a fair market value for the additional interest purchased by Sinclair 3. Second, Sinclair 3 became the operator of the wells.  Third, the contract stated that "should SOG sell, transfer or otherwise dispose of its interest in the [l]eases, Seismic Wells shall have the first and exclusive right to assume operations of the [l]eases."[3]

The parties also signed an Assignment and Bill of Sale the same day as the Replacement Participation Agreement.  The Assignment and Bill of Sale contained a provision indicating an assignment by Sinclair 1, stating:

"For purposes of clarification and acknowledgement, reference is made to that certain Assignment and Bill of Sale by and between Assignor and Sinclair Oil Corporation effective the 1st day of June 2005, . . . wherein *Assignee* was conveyed 3/8ths of 8/8ths undivided interest in and to *the same Assignee's Assigned Interests* being assigned herein . . . ; *Sinclair Oil Corporation, on or before March 1, 2006, assigned to Sinclair Oil and Gas Company, therefore, the interest conveyed in the [June 2005] [a]ssignment of interest* coupled with the conveyance in this Assignment and Bill of Sale increases Assignee's interest to 17/32nds of 8/8ths in Assignee's Assigned Interest."

---

[2] The parties agree the Replacement Participation Agreement included inaccurate statements. Specifically, each inaccuracy reflected Sinclair 3 was a party to the Initial Participation Agreement, when in reality, Sinclair 1 was the proper party.

[3] The Replacement Participation Agreement referred to Sinclair 3 as "SOG".

Finally, the parties executed a Joint Operating Agreement, which required Sinclair 3 to provide a tax identification number. In doing so, Ross Matthews, President of Sinclair 3, erroneously wrote in Sinclair 1's tax identification number.

To formalize the change to Sinclair 3 as the operator of the wells, Seismic Wells was required to send Sinclair 3 completed Form P-4s to file with the Texas Railroad Commission.  Form P-4s must have two pieces of information from the Form P-5: the new operator name exactly as shown on the P-5 and the new operator's operator number.  Sinclair 3 received Form P-4s from Seismic Wells that correctly recited Sinclair 3's operator information: the name Sinclair Oil and Gas Company and the operator number, 784548, which was different from Sinclair 1's operator number, 784546.  Tranckino denies ever seeing the Form P-5, which he states was unavailable publicly, and asserts that because he outsourced the forms' completion to another company, he did not look at the Form P-4s.

In 2011, five years after the parties signed the Replacement Participation Agreement, Seismic Wells sold its working interest in all but about 200 acres of the Miller Ranch Lease to Bold Energy.  Subsequently, in 2014, Bold Energy and Sinclair 3 decided to jointly market the interests they each owned in the lease.  When Bold Energy informed Seismic Wells of the plan, Seismic Wells replied that Sinclair had no right to transfer operations to a third party or sell and distribute [its] seismic data.  Seismic Wells eventually notified Sinclair 3 that it intended to exercise its contractual right to become the successor operator of the Miller Ranch wells should Sinclair 3 attempt to sell out.  Through counsel, Sinclair advised Seismic Wells in writing on June 20, 2014 that Seismic owned no leasehold interest nor residual rights in the Lease, consequently, Sinclair, as the exclusive operator, could assign its

interest without Seismic's consent.   Only after Seismic Wells received this letter did it begin investigating and ascertained that Sinclair 1 and Sinclair 3 were different entities.

Though the Sinclair entities' corporate reorganization had no effect on the sale of Seismic Wells's interest to Bold Energy, Seismic Wells saw the reorganization as providing grounds to sue the Sinclair companies and Matthews for various forms of fraud, breaches of the two Participation Agreements, and misinterpretation of the assignment to Bold Energy.   The case proceeded to jury trial, but the district court granted Sinclair's motion for JMOL after Seismic Wells rested and without hearing any defense evidence.

On appeal, Seismic Wells challenges the JMOL on several claims of fraud, breach of the Initial Participation Agreement, and breach of the Replacement Participation Agreement. Seismic Wells also contests the district court's denial of its motion to supplement the record with video depositions that were introduced as testimonial evidence at trial.

## II.

This court reviews the grant of JMOL by a district court *de novo*.  *See Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 624 (5th Cir. 2008). JMOL should be granted "only if the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Brown v. Bryan Cty.*, 219 F.3d 450, 456 (5th Cir. 2000) (quoting *Boeing v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc)).  However, JMOL should be denied if reasonable people could view the evidence and arrive at different conclusions. *See id*.  The court "consider[s] all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most

favorable to the non-moving party." *Id.* (internal quotation marks omitted) (quoting *Brown*, 219 F.3d at 456).

This court reviews the denial of a motion to supplement the record on appeal for abuse of discretion. *See Ghali v. United States*, 455 F. App'x 472, 475 (5th Cir. 2011) (per curiam).

## III.

### A. Motion to Supplement the Record

During the course of the trial, Seismic Wells put on ten witnesses, including five via videotaped depositions. The videotaped depositions were entered as the testimony of the witnesses in the videos, but for reasons never explained, the depositions were not entered into the record. The district court denied Seismic Wells's motion to supplement the record on appeal because the parties could not agree on which segments of the depositions the jury heard at trial.

There is no doubt that portions of the deposition testimony were offered in evidence, and they should have been transcribed by the court reporter. *See* 28 U.S.C. § 753(b) ("Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim . . . ."); FED. R. CIV. P. 32. That the court reporter failed to record the testimony at all is a significant breach of duty.

Nevertheless, the unavailability of the oral deposition testimony is not material for purposes of this appeal. Only one contention made by Seismic Wells involves the deposition testimony – a geophysicist employee's statement about seismic data in support of Seismic Wells's damages claim. This particular testimony, however, merely supports the other ample information in the record speaking to the alleged monetary value of the seismic data. Although the trial transcript is inaccurate through no fault of the parties, the

trial court did not commit a miscarriage of justice that would justify granting a new trial, *see Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 n.17 (5th Cir. 2012); and in any event, Sinclair indicated it would not oppose consideration of the video evidence, should it be necessary.  Under these circumstances, the district court's denial of Seismic Wells's motion to supplement the record on appeal is harmless error. *See United States v. Asprilla*, 42 F.3d 640, 641 (5th Cir. 1994) (holding the error is harmless where, assuming a district court incorrectly grants a party's motion to supplement the record, this court does not consider the documents).

## B. Judgment as a Matter of Law

### 1.  Fraud Claims

Seismic Wells's fraud claims center on the contention that Sinclair, along with its corporate representative Ross Matthews, committed and conspired to commit various frauds against it by misrepresenting that Sinclair 1 and Sinclair 3 were the same entity. Specifically, Seismic Wells claims that a reasonable jury could have found liability on four theories.  First, Sinclair 1 is secondarily liable for statutory fraud under Texas Business and Commerce Code § 27.01(a),[4] because Matthews and Scott Mayeda, corporate counsel for Sinclair 1, signed the Initial Participation Agreement on behalf of Sinclair 1, Matthews signed and Mayeda initialed the Replacement Participation Agreement, and Sinclair 1 benefitted from the fraud by avoiding liability for

---

[4] Texas Business and Commerce Code § 27.01(a) states,

> Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
> > (1)  false representation of a past or existing material fact, when the false representation is
> > > (A)  made to a person for the purpose of inducing that person to enter into a contract; and
> > > (B)  relied on by that person in entering into that contract . . . .

breach of the Initial Participation Agreement.  Second, Sinclair 2 is secondarily liable for statutory fraud under Texas Business and Commerce Code § 27.01(a) because Mayeda worked with Sinclair 2 and was aware of all of the assignments from Sinclair 1 to Sinclair 2 and then from Sinclair 2 to Sinclair 3. Third, Sinclair 3 is liable for common law fraud, statutory fraud, fraud by non-disclosure, and false promises.  Fourth, Matthews is liable for common law fraud, statutory fraud, fraud by non-disclosure, and false promises, because he signed the Replacement Participation Agreement and the Initial Participation Agreement.  All of these theories depend on the impact of the corporate reorganization within the Sinclair entities upon the parties' participation agreements, and more specifically, on the extent to which Sinclair's lack of transparency about the reorganization was fraudulent.

Whether any of these theories ultimately has merit is dubious.  We do not discuss them, however, because we are persuaded that as a matter of law, Seismic Wells sat on its rights too long before filing suit on June 5, 2015, nine years after every alleged fraudulent representation or nondisclosure occurred. Sinclair, in other words, bore its burden to prove that the statute of limitations ran on these causes of action.  *In re Hensley,* 201 F.3d 638, 644 (5th Cir. 2000) (party asserting limitations defense bears burden of proof).

Under Texas law, a four-year statute of limitations applies for all varieties of fraud.  *See* TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4).  Fraud-based claims in Texas generally accrue on the date the fraud is committed.  *See Hooks v. Samson Lone Star, Ltd. P'ship,* 457 S.W.3d 52, 57 (Tex. 2015). Limitations may be tolled, however, if the fraud could not have been discovered by the plaintiff in the exercise of reasonable diligence.  *Shell Oil Co.,* 356 S.W.3d at 929.  Whether the party used reasonable diligence is generally a fact question for the jury, but the court can determine it as a matter of law if

the party had actual or constructive notice of its claim, "or when information is 'readily accessible and publicly available.'" *Id.* (quoting *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929 (Tex. 2011)).

Seismic Wells contends it did not have a reasonable opportunity to discover the fraud until it filed this lawsuit.  Fraudulent concealment on the part of the defendant "prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered." *Hooks*, 457 S.W.3d at 57 (internal quotation marks omitted) (quoting *Ruebeck v. Hunt*, 176 S.W.2d 738, 739 (1943)).  But Sinclair gave Seismic Wells both actual and constructive notice of the different entities' existence by means of the parties' agreements and public filings. Therefore, Sinclair neither fraudulently concealed the corporate reorganization nor deprived Seismic Wells of a reasonable opportunity to learn of the restructuring.

To begin, the language of the Replacement Participation Agreement's Assignment and Bill of Sale, drafted by Sinclair, provided Seismic Wells with actual knowledge of the existence of Sinclair 3 as a separate entity from Sinclair 1.  As quoted above, a provision in the Assignment and Bill of Sale states, "Sinclair Oil Corporation, on or about March 1, 2006, assigned to Sinclair Oil and Gas Company . . . the interest conveyed in the [June 2005] [a]ssignment of interest."  That Tranckino believed that the language meant Sinclair had simply assigned the lease to itself is not reasonable.  As a sophisticated businessman, Tranckino should have known there was no justification for Sinclair's assigning the lease to itself, or at the very least should have inquired as to the reason for this language. Tranckino's confusion is not sufficient to overcome the statements in this document, which actually, if inartfully, conveyed actual information about the Sinclair corporate entities.

Other evidence of record supports that Seismic Wells had actual notice of the corporate reorganization, including the fact that Sinclair provided Seismic Wells with a Form P-4 that restated Sinclair 3's Operator Number from its Form P-5, rather than Sinclair 1's Operator Number. Sinclair 3's Form P-5 contained its operator number, 784548, and also accurately stated that Sinclair 1 was the previous organization operating in Texas, with an operator number of 784546. Again, Tranckino's testimony that Seismic Wells delegated completion of the Form P-4s and never looked at the Form P-5s does not obviate the fact that the Form P-5s were on file with the Railroad Commission and thus publicly available, or that Sinclair 3 complied with its obligation to provide Seismic Wells with Form P-4s containing its correct operator number. At most, Seismic Wells's outsourcing the completion of the Form P 4s means that it received constructive, as opposed to actual, notice – but either is sufficient to defeat Seismic Wells's claim that it was unable to discover the alleged fraud until after the statute of limitations had run.

Seismic Wells was also placed on constructive knowledge of the existence of Sinclair 3 as a separate entity from Sinclair 1 because of the state-required Applications for Registration of a For-Profit Corporation filed by Sinclair 2 and Sinclair 3. Sinclair assigned the trade name "Sinclair Oil and Gas Company" in 2006 and filed the Certificate of Withdrawal as to the trade name in 2007; any of these publicly filed documents gave Seismic Wells constructive notice that its continuing agreement with Sinclair 1 was actually with Sinclair 3, thereby triggering the statute of limitations on its fraud claims.

Unsurprisingly, Seismic Wells disputes that these documents put it on notice, blaming confusion caused by the erroneous use of Sinclair 1's tax identification number on the Joint Operating Agreement, the identical trade names, and the terminology in the Assignment and Bill of Sale. A

sophisticated business entity's confusion about common and significant documentary terminology and the nomenclature of the party with whom it deals is, however, unavailing.  The evidence presented here shows beyond question that the fraud "could have been discovered through reasonable diligence" within a short time after Seismic Wells executed the Replacement Participation Agreement, making the four-year statute of limitations applicable. *See Hooks*, 457 S.W.3d at 57 (quoting *Shell Oil Co.*, 356 S.W.3d at 929).  JMOL was appropriate on this basis.

## 2. Breach of Initial Participation Agreement

Seismic Wells claims Sinclair 1 breached the Initial Participation Agreement by assigning its rights under the Initial Participation Agreement to Sinclair 2, which then assigned to Sinclair 3. To support this argument, it relies on provisions of the Initial Participation Agreement that stipulate: (1) Sinclair 1 could not "sell, trade or license the [seismic] [d]ata to any third party;" (2) Sinclair 1 had the option to assume operation of the wells; and (3) once Sinclair 1 assumed operations, if Sinclair 1 chose to "sell, transfer or otherwise dispose of its interest . . . Seismic Wells [would] have the first and exclusive right to assume operations."

For the same reasons that plaintiff's fraud claims are defeated by the statute of limitations, these contract claims are barred by Texas's four-year statute of limitations governing civil suits.  TEX. CIV. PRAC. & REM. CODE § 16.051.  Seismic Wells was on actual and constructive notice of the corporate reorganization by the end of 2006, and the statute ran four years later, yet this lawsuit was not filed until June 2015.

In addition, if more were needed, Sinclair 1 never assumed the operator duties that are a prerequisite, under the Initial Participation Agreement, to Seismic Wells's right of first refusal.  Further, the quoted contract language is

insufficient to overcome the recognized principle, never acknowledged in Seismic Wells's briefing, that oil and gas operating rights are freely assignable or the fact that the Initial Participation Agreement was entered into by two sophisticated business parties and did not contain an explicit anti-assignment clause. *See Santa Fe Energy Operating Partners, L.P. v. Universal Res. Corp.*, No. 07-95-0342-CV, 1996 WL 457251, at *3 (Tex. App. Aug. 14, 1996) (recognizing operating agreements are "not so unique in the oil and gas industry as to involve a degree of trust and confidence singularly personal to the contracting parties . . . so as to render them unassignable as a matter of law." (internal quotation marks and citation omitted)). Finally, insofar as this claim rests on Sinclair's alleged "licensing" of seismic data, contrary to the Initial Participation Agreement, it lacks merit. The Initial Participation Agreement assigned no independent value to the seismic data; Tranckino's mere speculation that Sinclair 2 or 3 would have been willing to enter licensing agreements apart from the working interests to which they acceded is insufficient to support a jury issue.

On any of these grounds, granting JMOL as to the breach of the Initial Participation Agreement claim was proper.

### 3. Anticipatory Breach of Replacement Participation Agreement

Seismic Wells argues Sinclair 3 breached and repudiated the Replacement Participation Agreement when it (1) sent a letter to Seismic Wells stating it did not need Seismic Wells's permission to assign the lease to a third party, and (2) refused to transfer title to a well to Seismic Wells after it decided to plug a well that was leaking. The Replacement Participation Agreement states, "should [Sinclair 3] sell, transfer, or otherwise dispose of its interest in the [Miller Ranch lease], Seismic Wells shall have the first and exclusive right to assume operations of the [Miller Ranch lease.]" Seismic

13

Wells contends that, because Sinclair 3 tried to market its interest in the lease without the permission of Seismic Wells, and continued to do so after Seismic Wells stated it intended to exercise its right to assume operations, Sinclair 3 anticipatorily repudiated the Replacement Participation Agreement.

"In Texas, in order to prevail on a claim for anticipatory breach, a plaintiff must establish each of the following elements: (1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party." *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004) (citation omitted). Here, although Seismic Wells negotiated a right to assume operations should Sinclair 3 sell its interest in the Replacement Participation Agreement, it assigned that right to Bold Energy in a subsequent deal.[5] Seismic Wells cannot legitimately dispute that 2011 assignment and its consequences: the record contains a communication in which Tranckino trumpeted to Bold Energy, as a prospective assignee, this provision that would enable it to assume operations. As of 2014, there was no contractual arrangement between Sinclair 3 and Seismic Wells and no provision with Seismic Wells that Sinclair could breach.

Sinclair 3 did not repudiate Seismic Wells's right to assume operations from the Replacement Participation Agreement because it cannot repudiate a right that Seismic Wells no longer possessed. The contractual language in

---

[5] Sinclair concedes that Seismic Wells still has the right to assume operations of the Miller Spraberry Unit, which it did not assign to Bold Energy. The letter at issue specifically noted that Seismic Wells had "assigned all of [its] leasehold interest to Sinclair and others [including Bold Energy], save and except a 21.8750% working interest in 200 acres from the surface to 5700 feet as described in the Miller Spraberry Unit . . . , Sinclair is substituted as the Lessee under the Lease with all the rights previously held by the assignor." This statement contemplates that Seismic Wells still had rights in the Miller Spraberry Unit, unique from the rest of the lease, and does not indicate repudiation of Seismic Wells's claimed rights. Therefore, Seismic Wells cannot claim any breach or damages related to the Miller Spraberry Unit.

Seismic Wells's assignment of the Miller Ranch interests to Bold Energy does not reserve to it the right to assume operations under the Replacement Participation Agreement. Not only did the assignment incorporate the Replacement Participation Agreement, but it also specifically noted that Tranckino, a direct assignee of Seismic Wells, was the present owner of the interests from the Replacement Participation Agreement. Due to this assignment, Seismic Wells's arguments that it still had an option to assume operations on any land other than that reserved from the assignment, and its claim for anticipatory breach of the Replacement Participation Agreement, necessarily fail. JMOL on this claim was correct.

## IV.

For the aforementioned reasons, the judgment of the district court is **AFFIRMED**.

15